**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

      WILDEARTH GUARDIANS,

      Plaintiff,

v.

      SALLY JEWELL, in her official capacity as U.S. Secretary of the Interior,
      U.S. DEPARTMENT OF THE INTERIOR, and
      U.S. OFFICE OF SURFACE MINING AND RECLAMATION

      Federal Defendants.

---

**PETITION FOR REVIEW**

---

**INTRODUCTION**

    1.     This case involves a chronic failure of the Federal Defendants to involve the public and to address the potentially significant environmental and economic impacts of coal mining throughout the Rocky Mountain West in accordance with federal law.

    2.     At issue is the approval of "Mining Plans," which authorize the development of publicly owned coal. The Mineral Leasing Act of 1920, as amended ("MLA"), 30 U.S.C. § 181 *et seq*., and the Surface Mining Reclamation and Control Act ("SMCRA") of 1977, 30 U.S.C. § 1201 *et seq*., require the Secretary of the Interior to approve such Mining Plans as a prerequisite to the mining of publicly owned coal. Among other things, a mining plan must ensure that mining complies with applicable federal laws and regulations and be based on information prepared in compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4231 *et seq*. *See* 30 C.F.R. § 746 *et seq*.

3.      Federal Defendants have approved a number of Mining Plans authorizing federal coal development in Colorado, New Mexico, and Wyoming.  In approving these plans, Federal Defendants have failed to comply with NEPA.  Specifically, Federal Defendants failed to ensure that the public was appropriately involved in Federal Defendants' adoption of existing NEPA documents to support mining plan approvals, and failed to take a hard look at a number of potentially significant environmental impacts of mine expansion.

4.      This petition for review is over Federal Defendants' unlawful approvals of two mining plans in Wyoming, one in Colorado, and one in New Mexico.  However, this petition for review is also over Federal Defendants' ongoing pattern and practice of uninformed decisionmaking, in turn significantly threatening our health and environment throughout the western United States.  Accordingly, Plaintiff WildEarth Guardians (Guardians") alleges that Federal Defendants violated NEPA and the Administrative Procedure Act ("APA"), 5 U.S.C. §701 *et seq.*, by unlawfully approving the Mining Plans for the Black Thunder and Antelope Mines in Wyoming, the Bowie No. 2 Mine In Colorado, and the El Segundo Mine in New Mexico.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1346 (United States as a defendant), 2201 (declaratory relief), and 2202 (injunctive relief).  Guardians' claims arise under the judicial review provision of the APA, 5 U.S.C. §§ 701-706.  This Court has jurisdiction to grant Guardians its attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

6.      An actual and present controversy exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

7. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(2) because "a substantial part of the events or omissions giving rise to the claim" took place at Defendant Office of Surface Mining's ("OSM's") Western Regional Office in Denver, Colorado.

## PARTIES

8. Plaintiff WILDEARTH GUARDIANS is a non-profit membership organization based in Santa Fe, New Mexico, with offices in Denver, Colorado, and other western states. Guardians has more than 80,000 members and supporting activists, some of whom live, work, and/or recreate on public and private lands around and within view of the coal mines that are the subject of this Petition. Guardians and its members are dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Towards this end, Guardians and its members work to replace fossil fuels with clean, renewable energy in order to safeguard public health, the environment, and the Earth's climate.

9. Guardians' members who live, work, recreate, and conduct other activities on public and private lands on, around, and within view of lands affected by the mining plan approvals challenged herein are affected by poor air quality associated with coal mining in Colorado, New Mexico, and Wyoming, and have a substantial interest in ensuring they breathe the cleanest air possible. Guardians and its members also have substantial interests in intact ecosystems free from permanent contamination of riverine habitats that destroy fish populations. Guardians and its members use and enjoy public and private lands, and natural resources, including lands and natural resources affected by the mining plan approvals challenged herein, for recreational, scientific, aesthetic, conservation and other public purposes, and are harmed by the aesthetic and environmental impacts of coal mining there. Guardians and its members also have a substantial interest in ensuring that Federal Defendants comply with federal law,

including the requirements of NEPA.  Guardians' and its members' interests have been, are

being, and will continue to be irreparably harmed by Federal Defendants' approvals of the

mining plans challenged herein that will further degrade the air quality and the overall health of

the environment in Colorado, New Mexico, and Wyoming.

10.     Defendant SALLY JEWELL is sued in her official capacity as U.S. Secretary of

the Interior.  In this capacity she is responsible for approving, disapproving, or conditionally

approving Mining Plans and Mining Plan modifications pursuant to the MLA, 30 U.S.C. §

207(c) and SMCRA, 30 U.S.C. § 1273(c).

11.     Defendant U.S. DEPARTMENT OF THE INTERIOR is a Department of the

United States' federal government that manages much of the nation's minerals, public lands,

fish, and wildlife.  The Department of the Interior is ultimately responsible for ensuring

compliance with federal law when implementing the requirements of the MLA and SMCRA

with regards to the mining and management of publicly owned coal.

12.     Defendant OFFICE OF SURFACE MINING, RECLAMATION AND

ENFORCEMENT ("OSM") is a federal agency within the United States Department of the

Interior.  OSM is responsible for making recommendations to the Secretary of the Interior as to

whether or not, or under what conditions, she should approve Mining Plans or Mining Plan

modifications.  OSM is also responsible for ensuring agency compliance with NEPA and other

federal laws that apply to approval of mining plans and mining plan modifications.  OSM's

Western Regional Office, which is located in Denver, recommended the Secretary approve the

Mining Plans challenged herein.  All mining plan approval decisions challenged herein, and any

required NEPA analysis that should have been conducted, took place and/or were authorized by

OSM officials sitting in Denver, Colorado.

**LEGAL BACKGROUND**

I.      **The Mineral Leasing Act and Surface Mining Reclamation and Control Act**

13.     Under the MLA, the Secretary of Interior has two primary responsibilities regarding the disposition of federally owned coal.

14.     First, the Secretary is authorized to lease federal coal resources, where appropriate. *See* 30 U.S.C. §§ 181 and 201.  A coal lease must be in the "public interest" and include such "terms and conditions" as the Secretary of the Interior shall determine.  30 U.S.C. §§ 201 and 207(a); *see also* 43 C.F.R. §§ 3425.1-8(a) and 3475.1.  A coal lease is issued "for a term of twenty years and for so long thereafter as coal is produced annually in commercial quantities[.]"  30 U.S.C. § 207(a) and 43 C.F.R. § 3475.2.  The U.S. Bureau of Land Management ("BLM"), an agency within the Interior Department, is largely responsible for implementing the Secretary's coal leasing responsibilities.

15.     The second responsibility of the Secretary of the Interior is to authorize, where appropriate, the mining of federally owned coal through approval of a Mining Plan.  The authority to issue a Mining Plan is set forth under the MLA, which states that before any entity can take action on a leasehold that "might cause a significant disturbance of the environment," an operation and reclamation plan must be submitted to the Secretary of the Interior for approval.  30 U.S.C. § 207(c).  Referred to as a "Mining Plan" by SMCRA and its implementing regulations, the Secretary "shall approve or disapprove the [mining] plan or require that it be modified."  30 U.S.C. § 1273(c) and 30 C.F.R. § 746.14.  It is standard practice for the Assistant Secretary of the Interior for Land and Minerals Management to sign such Mining Plans on behalf of the Secretary.

16.     Although under SMCRA states have largely been delegated authority to regulate surface coal mining activities, the law prohibits the Secretary of Interior from delegating to states the duty to approve, disapprove, or modify Mining Plans for federally owned coal.  *See* 30 U.S.C. § 1273(c); *see also* 30 C.F.R. § 745.13(i).  SMCRA also prohibits the Secretary from delegating to states authority to comply with NEPA and other federal laws and regulations other than SMCRA with regard to the regulation of federally owned coal resources.  30 C.F.R. § 745.13(b).

17.     Among other things, a Mining Plan must, at a minimum, assure compliance with applicable requirements of federal laws, regulations, and executive orders, and be based on information prepared in compliance with NEPA.  *See* 30 C.F.R. § 746.13.  A legally compliant Mining Plan is a prerequisite to an entity's ability to mine leased federal coal.  Regulations implementing SMCRA explicitly state that, "[n]o person shall conduct surface coal mining and reclamation operations on lands containing leased Federal coal until the Secretary has approved the mining plan."  30 C.F.R. § 746.11(a).  To this end, a Mining Plan is "binding on any person conducting mining under the approved mining plan."  30 C.F.R. § 746.17(b).

18.     Although the Secretary of Interior is charged with approving, disapproving, or modifying a Mining Plan, OSM an agency within the Department of Interior, is charged with "prepar[ing] and submit[ting] to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan[,]" 30 C.F.R. § 746.13.  Thus, OSM plays a critical role in adequately informing the Secretary of Interior.

19.     A "mining plan shall remain in effect until modified, cancelled or withdrawn[.]" 30 C.F.R. § 746.17(b).  The Secretary must modify a Mining Plan where, among other things, there is "[a]ny change in the mining plan which would affect the conditions of its approval

pursuant to Federal law or regulation[,]" "[a]ny change which would extend coal mining and reclamation operations onto leased Federal coal lands for the first time[,]" or "[a]ny change which requires the preparation of an environmental impact statement under the National Environmental Policy Act[.]" 30 C.F.R. §§ 746.18(a), (d)(1), (d)(4), and (d)(5).

## II.   The National Environmental Policy Act

20.     NEPA aims to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. As Council on Environmental Quality ("CEQ") regulations implementing NEPA explain, the law "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

21.     Under NEPA, a federal agency must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4. In the EIS, the agency must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze and assess all direct, indirect, and cumulative environmental effects, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14 and 1502.16. The scope of the analysis must include "[c]umulative actions," or actions that "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same statement," and "[s]imilar actions," or actions that, "when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together[.]" 40 C.F.R. §§ 1508.25(a)(2) and (3).

22.     Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the

action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).  Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  "Effects" are synonymous with "impacts." 40 C.F.R. § 1508.8.

23.     An agency may also prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary.  40 C.F.R. §§ 1501.3, 1508.9.  An EA must include a discussion of alternatives and the environmental impacts of the action.  40 C.F.R. § 1508.9.

24.     In addition to analyzing impacts and considering alternatives, the scope of the analysis in an EIS must consider "[c]onnected actions," or actions that are closely related, as well as "[c]umulative actions," and "[s]imilar actions."  40 C.F.R. §§ 1508.25(a)(1), (2), and (3).

25.     If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI").  40 C.F.R. § 1501.4(e). Such evidence must demonstrate that the action "will not have a significant effect on the human environment[.]"  40 C.F.R. § 1508.13.  An assessment of whether or not an impact is "significant" is based on a consideration of the "context and intensity" of the impact.  40 C.F.R. § 1508.27.  "Context" refers to the scope of the proposed action, including the interests affected. 40 C.F.R. § 1508.27(a).  "Intensity" refers to the severity of the impact and must be evaluated with a host of factors in mind, including but not limited to "[t]he degree to which the proposed action affects public health or safety" and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b).

26.     Where a decision is issued based on an EIS, the federal agency must prepare a "public record of decision" ("ROD").  40 C.F.R. § 1505.2.  A ROD must "state what the decision was," "[i]dentify all alternatives considered," and "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not."  40 C.F.R. §§ 1505.2(a)-(c).

27.     An agency may adopt all or a portion of an EIS "provided that the statement or portion thereof meets the standards for an adequate statement" under the NEPA regulations.  40 C.F.R. § 1506.3(a).

28.     Federal agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."  40 C.F.R. § 1506.6(a).  To the fullest extent possible, agencies must "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment."  40 C.F.R. § 1500.2(d).  At a minimum, agencies must "[p]rovide public notice of . . . the availability of environmental documents so as to inform those persons and agencies who may be interested or affected."  40 C.F.R. § 1506.6(b). "Environmental documents" include EAs, EISs, FONSIs, and notices of intent to prepare and/or consider EISs.  40 C.F.R. § 1508.10.  The NEPA regulations stress that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and that "public scrutiny [is] essential to implementing NEPA."  40 C.F.R. § 1500.1(b).

29.     Where "significant new circumstances or information relevant to environmental concerns and bearings on" an action or impacts analyzed in an existing EIS or EA arise(s), an agency "shall" prepare a supplement to the NEPA document.  40 C.F.R. § 1502.9(c)(1).  A

supplement to an EIS "shall" generally be "prepare[d], circulate[d], and file[d]" in the same fashion as an EIS.  40 C.F.R. § 1502.9(c)(4).

### III.    Department of Interior and Related NEPA Regulations and Directives

30.    In 2008, the U.S. Department of Interior ("Interior") promulgated regulations to implement NEPA.  73 Fed. Reg. 61292 (Oct. 15, 2008); 43 C.F.R. § 46 *et seq.*  Interior and its agencies must use these regulations "in conjunction with and supplementary to" authorities set forth under the NEPA regulations.  *Id.*  Prior to the adoption of these regulations, Interior promulgated guidance in 2004 to implement NEPA in its Departmental Manual ("DM") at 516 DM, Chapters 1-7 (hereafter referred to as the "2004 516 DM").  69 Fed. Reg. 10866 (March 8, 2004).  The 2008 regulations superseded the 2004 516 DM.  The 2008 regulations and the 2004 guidance are similar in substance.

31.    Interior's NEPA regulations explain that adoption of both EISs and EAs are allowed.  43 C.F.R. § 46.120.  However, the NEPA regulations make clear that where an EIS or EA is adopted, the agency must determine "with appropriate supporting documentation, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives."  43 C.F.R. § 46.120(c).  Such supporting documentation "must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects."  *Id.*

32.    Interior's NEPA regulations also explicitly require that the public be notified "of the availability of an environmental assessment and any associated finding of no significant impact once they have been completed."  43 C.F.R. § 46.305(c).

33.    The current version of Interior's Departmental Manual sets forth NEPA implementing procedures specific to OSM.  OSM is the agency charged with making

recommendations to the Secretary of the Interior as to the approval, disapproval, or modification

of Mining Plans in accordance with 30 C.F.R. § 746.13.  *See* 516 DM 13.[1]  Chapter 13 of the

Manual sets forth categories of actions that normally require the preparation of an EIS.  516 DM

13 at 13.4.

34.     Among other things, the Departmental Manual explains that where approval of a

surface mining plan involves "environmental impacts [that] are not adequately analyzed in an

earlier environmental document covering the specific leases or mining activity," where "[t]he

area to be mined is 1280 acres or more, or the annual full production level is 5 million tons or

more," and where  "[m]ining and reclamation operations will occur for 15 years or more," an EIS

is normally required.  516 DM 13.4(A)(4).  Where an action is one that normally requires

preparation of an EIS and a decision is made not to prepare an EIS, the FONSI must be made

available for public review for 30 days prior to a decision in accordance with 40 C.F.R. §

1501.4(e)(2).  516 DM 13.4(B).

35.     OSM also adopted its own directives to implement NEPA.  *See* OSM Handbook

on Procedures for Implementing the National Environmental Policy Act ("OSM NEPA

Handbook").[2]  These directives emphasize that OSM may adopt NEPA documents produced by

other agencies.  If OSM does so, the agency must "ensure that the findings of the documents are

in full compliance with NEPA and OSM policy."  OSM NEPA Handbook, Chapter 3 § B.1.

Where an EIS is adopted, OSM's directives state that the agency should publish a "notice of

intent to adopt" in the Federal Register.  OSM Handbook, Chapter 3 § B.3.a.  A "notice of

intent" and the contents thereof are specifically defined at 40 C.F.R. § 1508.22. The directives

---

[1] available at
http://www.blm.gov/wo/st/en/prog/planning/nepa/webguide/departmental_manual/516_dm_chapter_13.html (last accessed Sept. 15, 2015).

[2] available at http://www.osmre.gov/lrg/docs/directive490_NEPAHandbook.pdf (last accessed Sept. 15, 2015).

state that "[a] ROD is prepared for all actions involving an EIS."  OSM Handbook, Chapter 3 §

B.3.c.

## IV.    The Administrative Procedure Act

36.    The APA provides a right to judicial review for any "person suffering legal wrong

because of agency action."  5 U.S.C. § 702.  Actions that are reviewable under the APA include

final agency actions "for which there is no other adequate remedy in a court."  *Id.*

37.    Under the APA, a reviewing court shall "hold unlawful and set aside agency

action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. § 706(2)(A).

## FACTUAL BACKGROUND

## I.    Environmental Impacts of Coal Mining

38.    Coal is mined with the express purpose of combusting it as fuel.  In the United

States the majority of coal mined is burned as fuel for power plants.  According to the U.S.

Energy Information Administration ("EIA"), 90% of all coal mined in the U.S. is used for

electricity generation.[3]

39.    In the United States, the majority of all coal burned comes from coal deposits

owned by the American public and managed by the U.S. Department of the Interior.  Since 2003,

the EIA reports that approximately 40% of the nation's coal has come from publicly owned

deposits.[4]

---

[3] EIA, "What is the role of coal in the United States?"
http://www.eia.gov/energy_in_brief/role_coal_us.cfm (last accessed Sept. 14, 2015).  According
to the EIA, the use of coal as a source of electricity has declined since 2007.
[4] EIA, "Sales of Fossil Fuels Produced from Federal and Indian Lands, FY 2003 through FY
2004" (July 2015) at 2, http://www.eia.gov/analysis/requests/federallands/pdf/eia-
federallandsales.pdf (last accessed Sept. 14, 2015).

40.     Virtually all publicly owned coal is found in the Rocky Mountain west. Throughout this region, both surface and underground mining techniques are used to extract coal.  This coal is mined primarily to fuel adjacent or nearby power plants, although in some cases it may be shipped to other power plants in the nation, or even internationally.  In the northeastern portion of Wyoming and southeastern portion of Montana, a region called the Powder River Basin, coal is mined to fuel hundreds of power plants in dozens of states.  The Powder River Basin is the largest coal-producing region in the United States and the vast majority of its coal is publicly owned and managed by the Department of Interior under its Federal Coal Leasing Program.

41.     Depending on the mining technique, mining operations can include, but are not limited to, the use of heavy equipment including diesel-powered trucks and other vehicles; on-site electricity generation; the stripping of overburden; topsoil removal and storage; blasting; construction of ventilation shafts; the drilling and operation of methane drainage wells; coal processing facilities; crushers; conveyors; construction and operation of coal storage silos and piles; coal load-out facilities; construction and maintenance of stormwater control facilities and/or other water quality-related facilities,; reclamation; waste disposal; road construction; monitoring well construction; dewatering of ground water; and other activities.  In some cases, coal ash from combustion is used as fill and disposed of at mines.

41.     The direct impacts of both underground and surface coal mining include air quality impacts, water quality impacts, fish and wildlife impacts, and alteration of landscapes and scenic views.  Indirectly, coal mining leads to environmental impacts associated with coal transport and coal combustion.  Such indirect impacts can include, but are not limited to, air pollution impacts from diesel-powered locomotives hauling coal trains, coal dust impacts from

coal trains or other transportation methods, air and waster pollution impacts from coal-fired power plants, and waste disposal (i.e., coal ash waste disposal) impacts associated with the operation of coal-fired power plants and other facilities that burn coal.

42.     Throughout the western United States, and in particular Colorado, New Mexico, and Wyoming, air pollution from coal mining directly and indirectly affects air quality. Emissions from coal mining include ozone precursors, particulate matter, and nitrogen dioxide.

43.     The U.S. Environmental Protection Agency ("EPA") sets health and welfare-based National Ambient Air Quality Standards ("NAAQS") for air pollutants in accordance with Section 109 of the Clean Air Act.  42 U.S.C. §§ 7409(a).  EPA is required to establish NAAQS to ensure that pollution concentrations in the air that the public breathes are limited to the levels requisite to protect health and welfare with an adequate margin of safety.  42 U.S.C. § 7409(b).

44.     Ozone is a criteria pollutant under the Clean Air Act, 42 U.S.C. § 7408.  Pursuant to the Clean Air Act, in 1997 EPA established a NAAQS for ozone at 0.080 parts per million ("ppm") over an eight-hour period.  62 Fed. Reg. 38,856 (July 18, 1997).  On March 27, 2008, EPA published a final rule for a new ozone NAAQS that significantly lowered the 8-hour standard to 0.075 ppm.  73 Fed. Reg. 16,436 (March 27, 2008).  This new ozone standard became effective on May 27, 2008, superseding the prior ozone NAAQS as of that time.  *Id.* Ozone forms when two pollutants—volatile organic compounds and nitrogen oxides—react with sunlight.  EPA has stated that the latest scientific evidence on ozone effects "is highly suggestive that [ozone] directly or indirectly contributes to non-accidental and cardiorespiratory-related mortality," including "premature mortality."  *Id.* at 16,443-46.

45.     Particulate matter less than 2.5 microns in diameter, or $PM_{2.5}$, is a criteria pollutant under the Clean Air Act.  42 U.S.C. § 7408.  In 1997, EPA promulgated two standards

for $PM_{2.5}$: an annual NAAQS of 15 micrograms per cubic meter ("$\mu g/m^3$") and a 24-hour NAAQS of 50 $\mu g/m^3$.  62 Fed. Reg. 38,652, 38,655 (July 18, 1997).  In 2006, EPA lowered the 24-hour PM2.5 standard to 35 $\mu g/m^3$.  71 Fed. Reg. 61,144 (Oct. 17, 2006).  In 2012, EPA lowered the annual standard to 12 $\mu g/m^3$.  78 Fed. Reg. 3,086 (Jan. 15, 2013).  Health risks associated with exposure to $PM_{2.5}$ include "premature mortality, aggravation of respiratory and cardiovascular disease [and] changes in lung function and increased respiratory symptoms."  &! Fed. Reg. at 61,152.

46.     $NO_2$ is a criteria pollutant under the Clean Air Act. 42 U.S.C. § 7408.  The $NO_2$ annual standard is 53 parts per billion ("ppb").  On July 15, 2009, EPA proposed to supplement the annual standard with a one-hour $NO_2$ standard of between 80 and 100 ppb.  74 Fed. Reg. 34,404-66 (July 15, 2009).  EPA believed it was necessary to supplement the annual standard with a standard governing short-term exposure because "recent studies provide scientific evidence that is sufficient to infer a likely causal relationship between short-term $NO_2$ exposure and adverse effects on the respiratory system."  *Id.* at 34,410.  According to EPA, "[e]pidemiologic evidence exists for positive associations of short-term ambient $NO_2$ concentrations below the current NAAQS with increased numbers of emergency department visits and hospital admissions for respiratory causes, especially asthma."  *Id.* at 34,413.  EPA promulgated the final one-hour $NO_2$ standard of 100 ppb on February 9, 2010.  75 Fed. Reg. 6,474 (Feb. 9, 2010).

47.     Air pollution that includes ozone precursors, $PM_{2.5}$, and $NO_2$ can be released from coal mining in many ways and impact ambient air quality in the context of relevant federal health and welfare standards.  For instance, diesel exhaust can produce particulate matter and nitrogen dioxide; methane venting and general ventilation from underground mines can release volatile

organic compounds, which react with sunlight to form ozone; stripping and blasting can produce particulate matter; and blasting can produce toxic emissions of nitrogen dioxide.

48.     Indirectly, coal-fired power plants and other industrial activities that rely on coal for fuel can release large amounts of air pollution and impact ambient air quality on local and regional scales.  The burning of coal can release particulate matter, volatile organic compounds, nitrogen dioxide, and a host of other harmful air pollutants.  Truck or train transportation methods can also produce nitrogen dioxide, volatile organic compounds, and particulate matter.

49.     Coal mining and combustion also release mercury and selenium.  Even small concentrations of these pollutants can degrade water quality and jeopardize aquatic species.  The U.S. Fish and Wildlife Service ("FWS") has found selenium to be one of the most toxic elements to fish, causing adverse effects to reproduction.  The FWS also found that fish ingesting very small amounts of mercury can experience reproductive impairment, behavioral changes, and brain damage.

50.     Climate change has been intensively studied and acknowledged at the global, national, and regional scales. Climate change is being fueled by the human-caused release of greenhouse gas emissions, in particular carbon dioxide. The Intergovernmental Panel on Climate Change ("IPCC") is a scientific body under the auspices of the United Nations that reviews and assesses the most recent scientific, technical and socio-economic information produced worldwide relevant to the understanding of climate change. In its most recent report to policymakers in 2014, the IPCC provided a summary of our understanding of human-caused climate change. Among other things, the IPCC summarized:[5]

---

[5] IPCC, "Climate Change 2014 Synthesis Report, Summary for Policymakers," available at http://www.ipcc.ch/pdf/assessment-report/ar5/syr/AR5_SYR_FINAL_SPM.pdf (last accessed Sept. 9, 2015).

- Human influence on the climate system is clear, and recent anthropogenic emissions of greenhouse gases are the highest in history.  Recent climate changes have had widespread impacts on human and natural systems.

- Warming of the climate system is unequivocal, and since the 1950s, many of the observed changes are unprecedented over decades to millennia.  The atmosphere and ocean have warmed, the amounts of snow and ice have diminished, and sea level has risen.

- Anthropogenic greenhouse gas emissions have increased since the pre-industrial era, driven largely by economic and population growth, and are now higher than ever.  This has led to atmospheric concentrations of carbon dioxide, methane, and nitrous oxide that are unprecedented in at least the last 800,000 years.  Their effects, together with those of other anthropogenic drivers, have been detected throughout the climate system and are extremely likely to have been the dominant cause of the observed warming since the mid-20th century.

- In recent decades, changes in climate have caused impacts on natural and human systems on all continents and across the oceans.  Impacts are due to observed climate change, irrespective of its cause, indicating the sensitivity of natural and human systems to changing climate.

- Continued emission of greenhouse gases will cause further warming and long-lasting changes in all components of the climate system, increasing the likelihood of severe, pervasive, and irreversible impacts for people and ecosystems.  Limiting climate change would require substantial and sustained reductions in greenhouse gas emissions which, together with adaptation, can limit climate change risks.

- Surface temperature is projected to rise over the 21st century under all assessed emission scenarios.  It is very likely that heat waves will occur more often and last longer, and that extreme precipitation events will become more intense and frequent in many regions.  The ocean will continue to warm and acidify, and global mean sea level to rise.

51.    In recognition of the economic consequences of human-caused climate change,

federal agencies have developed a protocol for assessing the social cost of carbon dioxide

emissions. The social cost of carbon is "an estimate of the economic damages associated with a

small increase in carbon dioxide ($CO_2$) emissions, conventionally one metric ton, in a given

year."[6] Conversely, the social cost of carbon can represent "the value of damages avoided for a

small emission reduction (i.e., the benefit of a $CO_2$ reductions)." The EPA has explained:

> The [social cost of carbon protocol] is meant to be a comprehensive estimate of climate
> change damages and includes changes in net agricultural productivity, human health,
> property damages from increased flood risk, and changes in energy system costs, such as
> reduced costs for heating and increased costs for air conditioning. However, given current
> modeling and data limitations, it does not include all important damages.

52.     A federal Interagency Working Group consisting of the EPA, Center for

Environmental Quality, Department of Energy, National Economic Council, Office of

Management and Budget, Department of Agriculture, Department of Commerce, Department of

Transportation and other agencies have prepared estimates of what the actual social cost of

carbon is. The Interagency Working Group prepared their first estimates of carbon dioxide in

2010.[7] This report disclosed that the cost of a metric ton of carbon dioxide in 2010 ranged

between $4.7 and $64.9 per metric ton. The actual estimate depended upon the assumed discount

rate, which itself was based on presumptions regarding the longevity of carbon dioxide in the

atmosphere and the damages caused by its presence.

53.     The 2010 report was subsequently updated in 2013. The 2013 report disclosed

that the cost of a metric ton of carbon dioxide at that time ranged between $11 and $98 per

metric ton.[8] The 2013 report was updated in 2015 and disclosed that the cost of carbon dioxide

emissions as of 2015 ranged between $11 and $105 per metric ton.[9]

---

[6] EPA, "The Social Cost of Carbon," available at
http://www.epa.gov/climatechange/EPAactivities/economics/scc.html (last accessed Sept. 9,
2015).
[7] Interagency Working Group on Social Cost of Carbon, United States Government, "Technical
Support Document: Social Cost of Carbon for Regulatory Impact Analysis Under Executive
Order 12866" February 2010, available at http://www.epa.gov/otaq/climate/regulations/scc-
tsd.pdf. (last accessed Sept. 9, 2015).
[8] Interagency Working Group on Social Cost of Carbon, United States Government, "Technical
Support Document:  Technical Update of the Social Cost of Carbon for Regulatory Impact
Analysis Under Executive Order 12866" (May 2013) at 3, available at

54.     According to EPA, on average, every one ton of coal burned releases approximately 1.8 metric tons of carbon dioxide.[10] Thus, a million tons of coal mined and burned would release more than 1.8 million metric tons of carbon dioxide and cost up to nearly $200 million.

55.     In terms of the mining and burning of publicly owned coal, the greenhouse gas emissions and associated costs are tremendous.  A report commissioned by The Wilderness Society in 2014 found that publicly owned coal production in 2012 was linked to 765,241,950 metric tons of carbon dioxide, which the report indicated represented more than 11% of all U.S. greenhouse gas emissions released in 2012.[11] Based on the Interagency Working Group's most recent estimates, these emissions could cost from $8 billion to more than $80 billion.

55.     The air, water, biodiversity, and climate impacts associated with coal transport and combustion are reasonably foreseeable indirect impacts associated with coal mining.  As such, these impacts are relevant as to whether or not the overall impacts associated with coal mining are significant.  An understanding and disclosure of such impacts is relevant to ensuring reasoned and well-informed decisions under NEPA.

---

https://www.whitehouse.gov/sites/default/files/omb/inforeg/social_cost_of_carbon_for_ria_2013 _update.pdf (last accessed Sept. 9, 2015).
[9] Interagency Working Group on Social Cost of Carbon, United States Government, "Technical Support Document:  Technical Update of the Social Cost of Carbon for Regulatory Impact Analysis Under Executive Order 12866" (July 2015) at 3, available at https://www.whitehouse.gov/sites/default/files/omb/inforeg/scc-tsd-final-july-2015.pdf (last accessed Sept. 9, 2015).
[10] EPA, "Greenhouse Gas Equivalencies Calculator, Calculations and References," available at http://www.epa.gov/cleanenergy/energy-resources/refs.html (last accessed Sept. 9, 2015).
[11] Stratus Consulting, "Greenhouse Gas Emissions from Fossil Energy Extracted From Federal Lands and Waters: an Update," Final Report Prepared for The Wilderness Society (Dec. 23, 2014), available at http://wilderness.org/sites/default/files/Stratus-Report.pdf (last accessed Sept. 9, 2015).

II.    **The Challenged Mining Plan Approvals**

56.    On November 26, 2013, the Secretary of the Interior approved a Mining Plan modification for the Antelope Mine in Wyoming.

57.    On May 16, 2014, the Secretary of the Interior approved a Mining Plan modification for the El Segundo Mine in New Mexico.

58.    On March 16, 2015, the Secretary of the Interior approved a Mining Plan modification for the Bowie No. 2 Mine in Colorado.

59.    On April 18, 2015 the Secretary of the Interior approved a Mining Plan modification for the Black Thunder Mine in Wyoming.

60.    These Mining Plan approvals in ¶¶ 56-59 authorized the mining of publicly owned coal.  This coal will be used for combustion in power plants and other industrial sources.

61.    All of the Mining Plan approvals in ¶¶ 56-59 fail to meet NEPA's public notification requirements and fail to adequately consider potentially significant direct, indirect, and cumulative environmental impacts in accordance with NEPA.  All of the Mining Plan approvals challenged herein violate NEPA, CEQ regulations implementing NEPA, Interior Department regulations implementing NEPA, and OSM directives.

A.    **2013 Antelope Mining Plan Approval**

62.    On November 26, 2013, the Secretary issued a Mining Plan modification to Antelope Coal LLC, a subsidiary of Cloud Peak Energy, for the mining of federally owned coal at the Antelope Mine in the Powder River Basin of Wyoming (hereafter referred to as the "2013 Antelope Mining Plan approval").  The Assistant Secretary of the Interior for Land and Minerals signed the 2013 Antelope Mining Plan approval.  The 2013 Antelope Mining Plan approval

authorized mining activities at the Antelope Mine in Converse and Campbell Counties, Wyoming, related to Federal Coal Leases WYW-163340 and WYW-177903.

63.     The 2013 Antelope Mining Plan approval authorized surface mining, a production rate of up to 37 million tons per year, and ultimate recovery of an additional 411 million tons of coal from 4,746 acres.  Under the decision, the life of the mine would be extended for an additional 13 years.

64.     On October 28, 2013, OSM issued a "Statement of NEPA Adoption and Compliance" for the 2013 Antelope Mining Plan approval.  This "Statement of NEPA Adoption and Compliance" adopted a coal leasing EIS prepared by BLM in December of 2008.

65.     In adopting BLM's 2008 EIS, OSM did not prepare a ROD, nor did the agency provide notice in the Federal Register of its intent to adopt the EIS.  The "Statement of NEPA Adoption and Compliance" is not a substitute for a ROD.  Federal Defendants did not provide public notice of the availability of the "Statement of NEPA Adoption and Compliance" either before deciding to adopt the 2008 EIS or before approving the 2013 Antelope Mining Plan.  The Assistant Secretary of the Interior relied on OSM's "Statement of NEPA Adoption and Compliance" when approving the 2013 Antelope Mining Plan.

66.     Although some documents related to the 2013 Antelope Mining Plan were posted on OSM's website in 2014, Federal Defendants did not provide any public notice of the availability of environmental documents related to the Mining Plan approval prior to the decision and did not provide any opportunity for public comments regarding OSM's NEPA process.

67.     The 2008 EIS adopted by Federal Defendants to support approval of the 2013 Antelope Mining Plan predates EPA's adoption a new NAAQS for $NO_2$ in 2010 and EPA's strengthening of the annual $PM_{2.5}$ NAAQS in 2012.  The 2008 EIS also predates the Social Cost

of Carbon protocol for measuring the costs of carbon dioxide emissions.  The 2008 EIS also does not analyze the climate impacts of connected, cumulative, and similar actions.  The 2008 EIS does not analyze the impacts of other past, present, and reasonably foreseeable Department of Interior federal coal mining and leasing approvals that have occurred since issuance of the 2008 EIS.  These approvals cumulatively impact climate.

68.     The Antelope Mine fuels dozens of power plants in the U.S.  The 2008 EIS does not analyze the reasonably foreseeable impacts of burning coal in these power plants using currently available methods.

69.     In adopting the 2008 EIS, OSM did not conduct an evaluation of whether new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.  The 2008 EIS explicitly states that further analysis of site-specific mining impacts would be completed subsequent to BLM's leasing approval.

**B.     2014 El Segundo Mining Plan Approval**

70.     On May 16, 2014, the Secretary issued a Mining Plan modification to Peabody Natural Resources Company for the mining of federally owned coal at the El Segundo Mine in New Mexico (hereafter referred to as the "2014 El Segundo Mining Plan approval").  The Principal Deputy Assistant Secretary of the Interior for Land and Minerals signed the 2014 El Segundo Mining Plan approval.  The 2014 El Segundo Mining Plan approval authorized mining activities at the El Segundo Mine in McKinley County, New Mexico related to Federal Coal Lease NMNM-126813.

71.     The 2014 El Segundo Mining Plan approval authorized surface coal mining, a production rate of up to 7.8 million tons per year, and ultimate recovery of 9.2 million tons of

coal from 435 acres.  Under the decision, the life of the mine would continue for an additional 19.8 years.

72.     On April 30, 2014, OSM issued a FONSI for the 2014 El Segundo Mining Plan approval.  OSM did not provide public notice of the FONSI prior to signing the FONSI or approving the Mining Plan.  According to OSM, the FONSI relied on a leasing EA prepared in January 2014 by the BLM.  The Principal Deputy Assistant Secretary of the Interior relied on OSM's FONSI when approving the 2014 El Segundo Mining Plan.

73.     Although some documents related to the 2014 El Segundo Mining Plan approval were posted on OSM's website in 2015, more than a year after the approval of the mining plan, Federal Defendants did not provide any public notice of the availability of environmental documents related to the Mining Plan approval prior to the decision and did not provide any opportunity for public comments regarding OSM's NEPA process.

74.     The 2014 EA adopted by Federal Defendants to support approval of the 2014 El Segundo Mining Plan does not take the requisite hard look at air quality impacts, particularly impacts in the context of the strengthened $NO_2$ and $PM_{2.5}$ standards.  The 2014 EA asserts that air quality impacts from expanded mining will not be significant because emission levels will be the same as levels from current mining activities, but does not actually analyze air quality impacts from an additional 19.8 years of mining.  The 2014 EA adopted by Federal Defendants also does not take the requisite hard look at climate impacts, in particular the costs of carbon dioxide emissions using the Social Cost of Carbon protocol.  The 2014 EA also does not analyze the climate impacts of connected, cumulative, and similar actions.  The 2014 EA does not analyze the impacts of other past, present, and reasonably foreseeable Department of Interior

federal coal mining and leasing approvals that have occurred within the last decade.  These approvals cumulatively impact climate.

75.     The El Segundo Mine fuels power plants primarily in eastern Arizona.  The reasonably foreseeable impacts of burning coal mined from El Segundo were not analyzed in BLM's 2014 EA.

76.     In adopting BLM's 2014 EA, OSM did not conduct an evaluation of whether new circumstances, new information, or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.  The 2014 EA explicitly states that further analysis of the site-specific mining impacts would be completed at a later stage.

### C.     2015 Bowie No. 2 Mining Plan Approval

77.     On March 16, 2015, the Secretary issued a Mining Plan modification to Bowie Resources, LLC for the mining of federally owned coal at the Bowie No. 2 Mine in Colorado (hereafter referred to as the "2015 Bowie No. 2 Mining Plan approval").  The Assistant Secretary of the Interior for Land and Minerals signed the 2015 Bowie No. 2 Mining Plan approval.  This decision authorized mining activities at the Bowie No. 2 Mine in Delta County, Colorado related to Federal Coal Lease COC-75916.

78.     The 2015 Bowie No. 2 Mining Plan approval authorized the surface impacts of underground coal mining, a production rate of up to six million tons per year, and ultimate recovery of approximately eight million tons of coal from 1,789 acres.  The Plan would also allow access to an additional four million tons of federal coal.  Under the decision, the life of the mine would be extended for an additional three to five and a half years.

79.     On December 18, 2014, OSM issued a FONSI for the 2014 Bowie No. 2 Mining Plan approval.  OSM did not provide public notice of the FONSI prior to signing the FONSI or

approving the Mining Plan.  According to OSM, the FONSI purportedly relied on an EA

prepared by BLM in 2013.  The Assistant Secretary of the Interior relied on OSM's FONSI when

approving the 2015 Bowie No. 2 Mining Plan.

80.     Although some documents related to the 2015 Bowie No. 2 Mining Plan were

posted on OSM's website in May of 2015, Federal Defendants did not provide any public notice

of the availability of environmental documents related to the Mining Plan approval prior to the

decision and did not provide any opportunity for public comments regarding OSM's NEPA

process

81.     The 2013 EA adopted by Federal Defendants to support approval of the 2015

Bowie No. 2 Mining Plan does not take the requisite hard look at air quality impacts, particularly

impacts in the context of the strengthened $NO_2$ and $PM_{2.5}$ standards. The 2013 EA adopted by

Federal Defendants also does not take the requisite hard look at climate impacts, in particular the

costs of carbon dioxide emissions using the Social Cost of Carbon protocol.  The 2014 EA also

does not analyze the climate impacts of connected, cumulative, and similar actions.  The 2014

EA does not analyze the impacts of other past, present, and reasonably foreseeable Department

of Interior federal coal mining and leasing approvals that have occurred within the last decade.

These approvals cumulatively impact climate.

82.     The Bowie No. 2 Mine fuels several power plants and exports coal overseas

through ports in California.  The reasonably foreseeable impacts of burning coal mined from the

Bowie No. 2 Mine were not analyzed in BLM's 2013 EA.

83.     In adopting BLM's 2013 EA, OSM did not conduct an evaluation of whether new

circumstances, new information or changes in the action or its impacts not previously analyzed

may result in significantly different environmental effects.  The 2013 EA explicitly states that further analysis of the site-specific mining impacts would be completed at a later stage.

### D.    2015 Black Thunder Mining Plan Approval

84.    On April 18, 2015, the Secretary issued a Mining Plan modification, without conditions, to Thunder Basin Coal Company, a subsidiary of Arch Coal, for the mining of federally owned coal at the Black Thunder Mine in the Powder River Basin of Wyoming (hereafter referred to as the "2015 Antelope Mining Plan approval").  The Assistant Secretary of the Interior for Land and Minerals signed the 2015 Black Thunder Mining Plan approval.  The 2015 Black Thunder Mining Plan approval authorized mining activities at the Black Thunder Mine in Campbell County, Wyoming, related to Federal Coal Lease WYW-174596.

85.    The 2015 Black Thunder Mining Plan approval authorized surface mining, a production rate of up to 190 million tons per year, and ultimately recovery of an additional 106.5 million tons of coal from 1,010.1 acres.  Under the decision, the life of the mine would continue for an additional 21 years.

86.    On March 5, 2015, OSM issued a "Statement of NEPA Adoption and Compliance" for the 2015 Black Thunder Mining Plan approval.  This "Statement of NEPA Adoption and Compliance" adopted a leasing EIS prepared by BLM in December of 2010.

87.    In adopting BLM's 2010 EIS, OSM did not prepare an ROD, nor did the agency provide notice in the Federal Register of its intent to adopt an existing EIS.  The "Statement of NEPA Adoption and Compliance" is not a substitute for a ROD.  Federal Defendants did not provide public notice of the availability of the "Statement of NEPA Adoption and Compliance" either before deciding to adopt the 2010 EIS or before approving the 2015 Black Thunder

Mining Plan.  The Assistant Secretary of the Interior relied on OSM's "Statement of NEPA Adoption and Compliance" when approving the 2015 Black Thunder Mining Plan.

88.     Although some documents related to the 2015 Black Thunder Mining Plan were posted on OSM's website in 2014, Federal Defendants did not provide any public notice of the availability of environmental documents related to the Mining Plan approval prior to the decision and did not provide any opportunity for public comments regarding OSM's NEPA process.

89.     The 2010 EIS adopted by Federal Defendants to support approval of the 2015 Black Thunder Mining Plan predates EPA's adoption a new NAAQS for $NO_2$ in 2010 and EPA's strengthening of the annual $PM_{2.5}$ NAAQS in 2012.  The 2010 EIS also predates the Social Cost of Carbon protocol for measuring the costs of carbon dioxide emissions.  The 2010 EIS also does not analyze the climate impacts of connected, cumulative, and similar actions.  The 2010 EIS does not analyze the impacts of other past, present, and reasonably foreseeable Department of Interior federal coal mining and leasing approvals that have occurred since the 2010 EIS.  These approvals cumulatively impact climate.

90.     The Black Thunder Mine is the second largest coal mine in the U.S. and fuels dozens of power plants. The 2010 EIS does not analyze the reasonably foreseeable impacts of burning coal in these power plants using currently available methods.

91.     In adopting the 2010 EIS, OSM did not conduct an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.  The 2010 EIS explicitly states that further analysis of the site-specific mining impacts would be completed at a later stage.

III.   <u>**Other Federal Coal Approvals**</u>

92.   During the same time period that Federal Defendants approved the Mining Plans challenged herein, they have also either proposed or authorized similar federal coal leasing and mining approvals that cumulatively impact the environment, particularly in terms of climate impacts, including carbon costs.  These proposals and authorizations have come as part of Federal Defendants' ongoing implementation of the federal coal program.

93.   Such specific similar proposals and authorizations posing cumulative impacts include, but are not limited to:

- BLM's proposal to offer for sale and issuance the Greens Hollow coal lease (UTU-84102), a 60 million ton coal lease containing 6,175 acres in central Utah. The lease, which is being pursued by Bowie Resources and would expand the company's SUFCO Mine near Emery, Utah, has been proposed by the BLM and a Supplemental EIS prepared, but it has not yet approved for sale and issuance. BLM, "Greens Hollow EIS," available at http://www.blm.gov/ut/st/en/fo/price/energy/coal.html (last accessed Sept. 9, 2015).

- BLM's proposal to offer for sale and issuance the Alton coal lease (UTU-081895), a 45 million ton coal lease containing 3,581 acres in southern Utah. The lease has been proposed by the BLM and a Draft EIS has been prepared, but it has not yet approved for sale and issuance. BLM, "Alton Coal Lease Tract Lease by Application Draft Environmental Impact Statement," available at http://www.blm.gov/ut/st/en/prog/energy/coal/alton_coal_project/alton_coal_eis.html (last accessed Sept. 9, 2015).

- BLM's proposal to offer for sale and issuance the Williams Draw coal lease (UTU-080043), a 30 million ton coal lease containing 4,191 acres in central Utah. The lease has been proposed by the BLM, but it has not yet approved for sale and issuance. BLM, "BLM Seeks Public Comment on Proposed Coal Lease Application," available at http://www.blm.gov/ut/st/en/info/newsroom/2013/may/blm_seeks_public_comment.html (last accessed Sept. 9, 2015).

- BLM's decision to offer for sale and issuance the Hay Creek II coal lease (WYW-172614), a 167 million ton coal lease containing 1,253 acres in the Powder River Basin of Wyoming. The lease was approved for sale and issuance by the BLM in 2013, although it has not yet been sold or issued. BLM, "Hay Creek II Coal Lease Application," available at http://www.blm.gov/wy/st/en/info/NEPA/documents/hpd/HayCreekII.html (last accessed Sept. 9, 2015).

- BLM's decision to offer for sale and issuance the Maysdorf II South coal lease (WYW-180711), a 271 million ton coal lease containing 2,305 acres in the Powder River Basin of Wyoming. The lease was approved for sale and issuance by the BLM in 2013, although it has not yet been sold or issued. BLM, "South Gillette Area Coal Leasing Project," available at http://www.blm.gov/wy/st/en/info/NEPA/documents/hpd/SouthGillette.html (last accessed Sept. 9, 2015).

- BLM's proposal to offer for sale and issuance the Spring Creek II coal lease (MTM-105485), a 198 million ton coal lease containing 1,602 acres in the Powder River Basin of Montana. The lease is currently under review by the BLM and was applied for in 2013. Cloud Peak Energy, "Lease by Application," available at http://www.blm.gov/style/medialib/blm/mt/blm_programs/energy/coal.Par.60997.File.dat /CPE%20File%201%20Application.pdf (last accessed Sept. 9, 2015).

- BLM's proposal to modify two coal leases (MTM-54716 and MTM-101099) to expand the Decker coal mine in the Powder River Basin of Montana by 40 million tons of coal and 500 acres. The lease modifications are currently under review by the BLM. BLM, "Decker Coal Mine Lease Modification Notification," available at http://www.blm.gov/pgdata/etc/medialib/blm/mt/field_offices/miles_city/coal.Par.61767. File.dat/Decker%20Lease%20Modification%20public%20scoping%20notice_4-30-13.pdf (last accessed Sept. 9, 2015).

- BLM's proposal to modify a coal lease (WYW-833995) to expand the Rawhide mine in the Powder River Basin of Wyoming by 26 million tons of coal and 291 acres. The lease modifications is currently under review by the BLM. BLM, "BLM Announces Scoping for Rawhide Mine Coal Lease Modification," available at http://www.blm.gov/wy/st/en/info/news_room/2015/february/03hpd-Rawhide.html (last accessed Sept. 9, 2015).

- U.S. Department of the Interior's Office of Surface Mining Reclamation and Enforcement's ("OSM's") proposal to approve ongoing mining and an expansion of the Colowyo coal mine in northwestern Colorado. There are two proposals. One that would approve ongoing mining on 1,562 acres and extend the life of the mine to 2017. OSM, "Colowyo Coal Mine, South Taylor/Lower Wilson Permit Expansion Area, Federal Mining Plan Modification Environmental Assessment," available at http://www.wrcc.osmre.gov/initiatives/colowyoMineSouthTaylor.shtm (last accessed Sept. 10, 2015). The second is a proposal that would expand the mine by more than 16,000 acres and continue the life of the mine for 20-40 years. OSM, "Colowyo Coal Mine Collum Permit Expansion Area Project Mining Plan Environmental Assessment," available at http://www.wrcc.osmre.gov/initiatives/colowyo/documentlibrary.shtm (last accessed Sept. 10, 2015).

- OSM's proposal to approve an expansion of the Rosebud coal mine in the Powder River Basin of Montana. The proposal would expand the mine by more than 6,000 acres and continue the life of the mine for 19 years. OSM, "Western Energy Company Rosebud

Coal Mine Area F Project," available at
http://www.wrcc.osmre.gov/initiatives/westernEnergy.shtm (last accessed Sept. 10,
2015).

- OSM's February 24, 2015 approval of an expansion of the Bull Mountains mine in
Montana.  The decision expanded the mine by 2,537 acres and extended the life of the
mine by nine years.  OSM, "Bull Mountains Mine No. 1," website available at
http://www.wrcc.osmre.gov/initiatives/bullMountainsMine.shtm (last accessed Sept. 15,
2015).

94.     In addition, BLM has approved numerous lease readjustments pursuant to 43

C.F.R. § 3451, effectively renewing and extending the life of numerous coal leases.

95.     Federal Defendants did not analyze the cumulative climate impacts of these the

proposals and authorizations listed in ¶ 93 before approving the Mining Plans challenged herein.

Federal Defendants were required to do so under NEPA.  As OSM acknowledged in its recent

EA for the Colowyo Coal Mine South Taylor/Lower Wilson Permit Expansion Area, an analysis

of the reasonably foreseeable climate impacts of coal mining must take into consideration

greenhouse emissions at a much larger scale than just a single mine.  In this EA, OSM

acknowledged that the scope of the analysis of climate impacts needed to be much larger than

just a single coal mine and analyzed the climate impacts of mining at Colowyo in the context of

national and global greenhouse gas emissions.[12]  OSM acknowledged that the scope of a climate

impacts analysis must be broader than a single mine, and must include all similar and cumulative

actions.

---

[12] OSM, "Colowyo Coal Mine, South Taylor/Lower Wilson Permit Expansion Area, Federal
Mining Plan Modification Environmental Assessment" (July 27, 2015), at 4-17—4-20, available
at
http://www.wrcc.osmre.gov/initiatives/colowyoMineSouthTaylor/documents/Colowyo_SouthTa
ylor_LowerWilson_EA_20150727.pdf (last accessed Sept. 14, 2015).

## CLAIMS FOR RELIEF

### First Claim for Relief
### Violation of NEPA—Failure to Provide Public Notice and Participation

96.     Each and every allegation set forth in this complaint is incorporated herein by reference.

97.     Federal Defendants approved the 2013 Antelope Mining Plan, the 2014 El Segundo Mining Plan, the 2015 Bowie No. 2 Mining Plan, and the 2015 Black Thunder Mining Plan as part of an ongoing pattern and practice of taking federal action on mining plans in violation of NEPA's requirement that, to the fullest extent possible, all federal agencies are obligated to "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2.

98.     NEPA's implementing regulations require Federal Defendants to "(a) [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures" and to "(b) [p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6. NEPA regulations also require circulation of FONSIs for public review in certain situations, including when agency NEPA procedures require it. 40 C.F.R. § 1501.4(e)(2). OSM's NEPA Handbook requires that, when OSM adopts an EIS, OSM must publish a "notice of intent to adopt" in the Federal Register. OSM Handbook, Chapter 3 § B.3.a.

99.     "NEPA procedures must ensure that environmental information is available to public officials and citizens *before decisions are made and before actions are taken*." 40 C.F.R. § 1500.1 (emphasis added). NEPA's implementing regulations provide extensive public involvement requirements. 40 C.F.R. § 1506.6.

100.     Federal Defendants did not provide notice to the public of the availability of or the opportunity to review and/or comment on OSM's FONSIs, "Statements of NEPA Adoption and Compliance," and other information prepared pursuant to comply with NEPA prior to the approval of the Mining Plans challenged herein.  Federal Defendants' failure to provide notice of the availability of environmental documents prior to decisions being made violates NEPA, 40 C.F.R. §§ 1501.4(e)(1); 1506.6, and the APA, 5 U.S.C. §§ 706(2)(A).

<u>Second Claim for Relief</u>
**Violation of NEPA—Failure to Supplement Existing EAs and EISs**

101.     Each and every allegation set forth in this complaint is incorporated herein by reference.

102.     NEPA regulations provide that every agency "shall" prepare supplements to environmental analyses if there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

103.     In the interim between completion of the EAs and EISs adopted by Federal Defendants to support approval of the Mining Plans challenged herein, new information and circumstances relevant to environmental concerns and bearing on the Mining Plan approvals and their impacts have come to be.  This new information and these new circumstances include, but are not limited to: 1) EPA gained a better understanding of adverse health impacts and therefore strengthened air quality standards for pollutants generated by coal mining, transport, and burning; 2) considerable national resources and attention have been directed toward efforts to quantify and reduce greenhouse gas emissions; 3) federal agencies have developed credible and useful methods of assessing carbon costs; 4) a number of new coal leasing and mining approvals

have been issued in several western states; and 5) Federal Defendants have proposed a number of similar coal leasing and mining approvals in several western states.

104.    This new information represents significant new information relevant to environmental concerns associated with the challenged decisions and not previously analyzed in existing NEPA documents, therefore, Federal Defendants were required to supplement the EAs and EISs they relied on using current conditions and information before authorizing additional coal mining.

105.    Federal Defendants violated NEPA by failing to supplement the EAs and EISs relied on for each Mining Plan decision challenged herein before approving the Plans.  This failure was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA and the APA.  5 U.S.C. §§ 706(1), (2)(A).

### Third Claim for Relief
### Violation of NEPA—Failure to Provide Documentation Supporting Adoption of EAs or EISs

106.    Each and every allegation set forth in this complaint is incorporated herein by reference.

107.    Where a federal agency adopts an EA or EIS under NEPA, the agency is required to provide "appropriate supporting documentation [] that [the adopted EA or EIS] adequately assesses the environmental effects of the proposed action and reasonable alternatives."  43 C.F.R. § 46.120(c).  Such supporting documentation "must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects." *Id*.

108.    In approving the 2013 Antelope, 2014 El Segundo, 2015 Bowie No. 2, and 2015 Black Thunder Mining Plans, Federal Defendants adopted existing EAs and/or EISs to support

their decisions. Federal Defendants did not provide supporting documentation in their decision records showing their evaluation of whether the EAs and/or EISs adequately analyzed the environmental impacts of coal mining pursuant to NEPA. Federal Defendants did not include in their decision records an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.

109. Federal Defendants' failure to provide appropriate documentation to support adoption of EAs and/or EISs violates NEPA, 43 C.F.R. § 46.120(c), and was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA and the APA. 5 U.S.C. §§ 706(1), (2)(A).

**Fourth Claim for Relief**
**Violation of NEPA—Failure to Prepare Records of Decision**
**for the Adoption of Environmental Impact Statements**

110. Each and every allegation set forth in this complaint is incorporated herein by reference.

111. NEPA requires that where a decision is based on an EIS, a "public record of decision" must be prepared. 40 C.F.R. § 1505.2. A ROD must "state what the decision was," "[i]dentify all alternatives considered," and "[s]tate whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not." 40 C.F.R. §§ 1505.2(a)-(c).

112. In issuing the 2013 Antelope Mining Plan and the 2015 Black Thunder Mining Plan, Federal Defendants adopted existing EISs prepared by BLM for coal leasing decisions. Federal Defendants did not issue RODs to properly document and support their decisions, as

required by NEPA regulations.  Instead, Federal Defendants prepared a "Statement of NEPA Adoption and Compliance" for the Antelope and Black Thunder Mining Plan approvals.

113.    Federal Defendants' failure to issue RODs violates NEPA, 40 C.F.R. § 1505.2 and was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA and the APA.  5 U.S.C. §§ 706(1), (2)(A).

### Fifth Claim for Relief
### Violation of NEPA—Failure to Take a Hard Look at the
### Direct, Indirect, and Cumulative Impacts to Air Quality

114.    Each and every allegation set forth in this complaint is incorporated herein by reference.

115.    In approving the 2013 Antelope, 2014 El Segundo, 2015 Bowie No. 2, and 2015 Black Thunder Mining Plans, Federal Defendants adopted NEPA documents that did not take a hard look at the reasonably foreseeable air quality impacts of mining including the direct impacts of mining, the indirect impacts of coal burning and transport, and the cumulative impacts of these activities.  Federal Defendants adopted EAs and EISs that did not address air quality impacts based on updated air quality standards.

116.    Federal Defendants' failure to take a hard look at the direct, indirect, and cumulative impacts to air quality from the Mining Plan approvals challenged herein was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA and the APA.  5 U.S.C. §§ 706(1), (2)(A).

### Sixth Claim for Relief
### Violation of NEPA—Failure to Take a Hard Look at the
### Direct, Indirect, and Cumulative Impacts to the Climate

117.    Each and every allegation set forth in this complaint is incorporated herein by reference.

118.    In approving the 2013 Antelope, 2014 El Segundo, 2015 Bowie No. 2, and 2015 Black Thunder Mining Plans, Federal Defendants adopted NEPA documents that did not take a hard look at the reasonably foreseeable climate impacts of mining including the direct impacts of mining, the indirect impacts of coal burning and transport, and the cumulative impacts of these activities.  Federal Defendants adopted EAs and EISs that did not address all reasonably foreseeable greenhouse gas emissions associated with mining and the costs of all reasonably foreseeable carbon dioxide emissions using the social cost of carbon protocol.

119.    Federal Defendants' failure to take a hard look at the direct, indirect, and cumulative impacts to climate from the Mining Plan approvals challenged herein was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA and the APA.  5 U.S.C. §§ 706(1), (2)(A).

## Seventh Claim for Relief
### Violation of NEPA—Failure to Analyze the Climate Impacts of Similar and Cumulative Actions

120.    Each and every allegation set forth in this complaint is incorporated herein by reference.

121.    NEPA requires that the scope of the analysis in an EIS include cumulative actions and similar actions.  40 C.F.R. §§ 1508.25(a)(2) and (3).

122.    In approving the 2013 Antelope, 2014 El Segundo, 2015 Bowie No. 2, and 2015 Black Thunder Mining Plans, Federal Defendants adopted NEPA documents that did not analyze the impacts of similar federal coal approvals and proposals that cumulatively impact climate. Federal Defendants did not analyze the impacts of numerous federal coal leasing and mining plan actions, even though such actions are cumulative in terms of their greenhouse gas emissions and carbon cost impacts and similar in terms of their climate impacts, timing, and geography.

123.     Federal Defendants' failure to analyze the climate impacts of cumulative and similar federal coal approvals is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of NEPA and the APA.  5 U.S.C. §§ 706(1), (2)(A).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.     Declare that Defendants violated NEPA by approving the 2013 Antelope, 2014 El Segundo, 2015 Bowie No. 2, and 2015 Black Thunder Mining Plans;

B.     Vacate and remand the aforementioned Mining Plan approvals to the extent they authorize coal mining activities;

C.     Enjoin Federal Defendants from re-issuing the aforementioned Mining Plan approvals until such time as they have demonstrated compliance with NEPA;

D.     Enjoin mining, but not reclamation, operations in all areas covered by the aforementioned Mining Plan approvals until such time as Federal Defendants have demonstrated compliance with NEPA;

E.     Grant Plaintiff its costs of litigation including reasonable attorneys' fees as provided by the Equal Access to Justice Act, 28 U.S.C. § 2412; and

F.     Grants Plaintiff such additional and further relief as the Court deems just and proper.

Respectfully submitted on this 15th day of September, 2015.

/s/ Samantha Ruscavage-Barz        /s/ Sarah McMillan
WildEarth Guardians                WildEarth Guardians
516 Alto Street                      P.O. Box 7516
Santa Fe, NM 87501           Missoula, MT 59807
(505) 401-4180                     (406) 549-3895
sruscavagebarz@wildearthguardians.org    smcmillan@wildearthguardians.org

*Attorneys for Plaintiff WildEarth Guardians*